IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:17-CV-00017-RN

**Robert Lee Bridgers,**

               Plaintiff,

v.

**Nancy A. Berryhill**, Acting
Commissioner of Social Security,[1]

               Defendant.

**Memorandum & Order**

      Plaintiff Robert Lee Bridgers instituted this action on February 14, 2017, to challenge the denial of his application for social security income. Bridgers claims that the Administrative Law Judge ("ALJ") Mason Hogan erred in (1) evaluating the medical opinion evidence, (2) failing to adopt the visual limitations set forth by one of Bridgers's treating providers, and (3) identifying other jobs that Bridgers could perform. Both Bridgers and Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 20, 24.

      After reviewing the parties' arguments, the court has determined that ALJ Hogan reached the appropriate decision. ALJ Hogan properly considered the medical opinion evidence, including the visual limitations assessed by Dr. Edwin Swann. Additionally, ALJ Hogan did not err in relying on the testimony of a Vocational Expert ("VE") to identify, at step five, other work suitable for

---

[1] Berryhill replaced Carolyn Colvin as the Acting Commissioner of Social Security on January 20, 2017.

Bridgers. Therefore, the court denies Bridgers's motion, grants Berryhill's motion, and affirms the Commissioner's decision.[2]

I. **Background**

On November 27, 2012, Bridgers protectively filed an application for disability benefits alleging a disability that began on October 19, 2012. After his claim was denied at the initial level and upon reconsideration, Bridgers appeared before ALJ Hogan for a hearing to determine whether he was entitled to benefits. ALJ Hogan determined Bridgers was not entitled to benefits because he was not disabled. Tr. at 9–25.

ALJ Hogan found that Bridgers had several severe impairments: degenerative joint disease of the lumbar spine with SI joint dysfunction, myofascial pain syndrome, moderate carpal tunnel syndrome, history of left rotator cuff tear, status post surgical repair, possible osteoarthritis of the knees, glaucoma, and afferent pupillary defect. Tr. at 11. ALJ Hogan found that Bridgers's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 12.

ALJ Hogan then determined that Bridgers had the residual functional capacity ("RFC") to perform a range of light work with additional limitations. Tr. at 13. He can never climb ladders, ropes, or scaffolds but he can occasionally climb ramps and stairs. *Id.* Bridgers can occasionally balance, stoop, kneel, crouch, and crawl and occasionally reach with his dominant upper extremity. *Id.* He can also frequently handle and finger with the bilateral upper extremities. *Id.*

Bridgers must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation and hazards such as unprotected heights and dangerous machinery. *Id.* Finally, Bridgers cannot do any work that requires depth perception. *Id.*

---

[2] The parties have consented to jurisdiction by a United States Magistrate Judge. 28 U.S.C. § 636(c). 28 U.S.C. § 636(b). D.E. 16.

2

ALJ Hogan concluded that Bridgers was incapable of performing his past relevant work as an apartment maintenance worker or industrial truck driver. Tr. at 23. But ALJ Hogan determined that, considering Bridgers's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Bridgers was capable of performing. *Id.* These include: cashier, furniture rental consultant, and parking lot attendant. Tr. at 23–24. Thus, ALJ Hogan found that Bridgers was not disabled. Tr. at 25.

After unsuccessfully seeking review by the Appeals Council, Bridgers commenced this action in February 2017. D.E. 5.

## II. Analysis

### A. Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to determining whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B. Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson* v. *Barnhart*, 434 F.3d 650 (4th Cir. 2005). The ALJ must consider the factors in order. At step one, if the claimant is engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or

combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Background

Bridgers has a history of back pain, knee pain, carpal tunnel, and diminished vision. In August 2012, Robert Lawrence, PA, examined Bridgers. Tr. at 283. He refilled prescriptions related to Bridgers's back pain. *Id.* Four months later, Lawrence provided follow-up care for Bridgers's HIV. Tr. at 277–78. Treatment notes reflect that Bridgers had vision loss in his right eye due to untreated glaucoma. Tr. at 278–79.

Around this same time, Bridgers sought treatment with Dr. Holly Warren for his chronic back pain. Tr. at 365. She prescribed medication and recommended he pursue care with a pain management clinic. *Id.* The following month, Dr. Mackenzie Smith saw Bridgers for his back pain. Tr. at 368–70. She, too, prescribed medication and suggested he pursue pain management treatment. *Id.*

In January 2013, Dr. Smith issued a Medical Source Statement opining that Bridgers's symptoms were severe enough to interfere with the attention and concentration required to perform simple tasks. Tr. at 328–29. Dr. Smith also assessed the following limitations: Bridgers could sit for ten minutes at a time for up to two hours in an eight-hour workday; he could stand or walk for ten minutes at a time for up to two hours in an eight-hour workday; he is unable to walk a city block without rest without experiencing pain; he would require unscheduled breaks every 15–30 minutes; he could occasionally lift or carry up to ten pounds and could not lift or carry more than 20 pounds; and he would be absent from work four or more times per month due to his impairments. *Id.*

Later that month, Dr. Yen Nguyen examined Bridgers's vision due to his complaints of itchiness, dryness, and excessive watering in the left eye. Tr. at 349–50. Dr. Nguyen assessed a pupillary defect in the right eye and glaucoma in the left eye, and prescribed eye drops for both conditions. *Id.* At a follow-up visit the following month, Dr. Nguyen assessed the same conditions and treatment. Tr. at 354–55. By March, Dr. Nguyen referred Bridgers to a specialist after noticing a decline in his vision. Tr. at 358.

From March through May, Bridgers sought follow-up care from Dr. Smith's office for his back pain. Tr. at 372–76. Providers prescribed medications and administered injections. *Id.* A May 2013 examination found an abnormal gait and low back tenderness. Tr. at 377.

A June 2013 MRI of Bridgers's lumbar spine showed moderate lumbar spondylosis from L3-L4 through L5-S1 with narrowing of the central canal and subarticular recess, and disc material contacting the nerve roots at L3 and L4. Tr. at 395–96. It also showed severe right facet arthropathy and moderate left facet arthropathy at L5-S1 with a diffuse bulge causing mild central canal and

neural foraminal narrowing. *Id.* X-rays of the lumbar spine revealed moderate multilevel degenerative changes of the lumbar spine. Tr. at 399.

Dr. E.C. Land performed a consultative examination later that month. Tr. at 391–93. His examination noted a dense cataract in the right eye and the formation of one in the left eye. Tr. at 392. Bridgers also displayed a decreased range of motion in the cervical spine with tenderness over his lumbar region and a limited ability to bend and squat. *Id.* His gait was stiff but he was able to ambulate at times without a cane. *Id.* Dr. Land assessed low back pain secondary to degenerative arthritis and glaucoma, with loss of vision in the right eye. Tr. at 393. He opined that Bridgers would have mild limitations in squatting, lifting, and bending, as well as mild restrictions in the repetitive use of his left shoulder due to a prior surgery. *Id.*

Three months later, Bridgers saw Dr. William Doss[3] for his back pain. Tr. at 401. Dr. Doss's examination found tenderness at the left SI joint and positive Gaenslen, FABER, and Gillett tests on the left side. Tr. at 403. Dr. Doss prescribed medication and referred Bridgers for an SI joint injection and physical therapy. *Id.*

Bridgers began physical therapy later that month. Tr. at 531–35. An examination revealed stiff posture, antalgic gait, tender paraspinal muscles, and painful range of motion. *Id.* Bridgers received gait training with an assistive device. Tr. at 535.

In October, Bridgers's eyesight was reevaluated at East Carolina Center for Eyesight. Tr. at 426. He reported a lack of right eye vision for one year and left eye strain. *Id.* Dr. Charles Titone opined that cataract surgery may improve Bridgers's vision. Tr. at 430. A follow-up visit later that month yielded the same assessment and recommendation. Tr. at 433.

---

[3] ALJ Hogan's decision incorrectly refers to this provider as Dr. Dossa. Tr. at 21.

During this time, Bridgers continued to receive physical therapy for back and neck pain. Tr. at 520, 526. He demonstrated tenderness and pain with range of motion in both his back and neck. Tr. at 521–22, 527. Bridgers gait pattern showed impairment. Tr. at 522. The following month, Bridgers rated his pain as an eight on a scale of one to ten. Tr. at 667. He also reported minimal relief from the SI injection, and an examination again found tenderness and inflammation in his back. Tr. at 667–68, 673–74. His gait was noted to have improved with a lengthened stride. Tr. at 667, 673.

In December 2013, Bridgers sought follow-up care from Dr. Doss for his back pain. Tr. at 436. An examination revealed paraspinal tenderness and Dr. Doss assessed myofascial syndrome with SI joint dysfunction. Tr. at 438. He administered an injection and prescribed medications to Bridgers. Tr. at 438–39.

Three months later, Dr. Daniel Moore treated Bridgers for his complaints of daily back and hand pain. Tr. at 448. Dr. Moore noted tenderness and spasms, assessed SI joint pain, and prescribed medications. Tr. at 449. Although injection treatment was recommended, Bridgers declined for financial reasons. *Id.* Bridgers returned to Dr. Doss in April reporting hand pain that woke him from sleep. Tr. at 442–44. Electrodiagnostic testing revealed compression neuropathy of bilateral median nerves consistent with moderate carpal tunnel syndrome. Tr. at 442, 447.

Returning to Dr. Doss in May, Bridgers complained of back pain, wrist pain, and numbness. Tr. at 614–15. An examination showed a positive point test at the left SI joint and a positive carpal tunnel test. Tr. at 616. Dr. Doss prescribed medication and administered an injection to Bridgers's left hand. Tr. at 614, 617.

Bridgers next sought treatment from Dr. Doss for his hand and back pain in September 2014. Tr. at 465. Bridgers reported increased pain and difficulty sleeping. *Id.* Dr. Doss again

7

prescribed medication and referred Bridgers to a neurosurgeon for right carpal tunnel release. Tr. at 465–66. Bridgers returned to Dr. Doss three months later, again reporting hand and back pain. Tr. at 461. Dr. Doss assessed right carpal tunnel syndrome and left SI joint dysfunction, for which he prescribed medication. *Id.*

Dr. Doss completed a residual functional capacity questionnaire in January 2015. Tr. at 771–72. Noting Bridgers's numbness and tingling from his carpal tunnel syndrome, Dr. Doss opined that Bridgers's symptoms would frequently interfere with the attention and concentration required to perform simple, work-related tasks. *Id.* He also stated that Bridgers could sit for 60 minutes at a time for up to six hours in an eight-hour workday and stand for ten minutes at a time for up to six hours in an eight-hour workday. *Id.* Dr. Doss also found that Bridgers would require an option to shift positions at will from standing, sitting, or walking. *Id.* Bridgers would also require unscheduled, five-minute breaks. *Id.* Bridgers could frequently lift or carry less than ten pounds and occasionally lift or carry up to 20 pounds. *Id.* Finally, Dr. Doss opined that Bridgers's impairments would result in his absence from work two or more times per month. *Id.*

Two months later, Bridgers sought treatment from Dr. Mathew Gowans for back pain radiating into his right leg. Tr. at 456, 459. Dr. Gowans's examination disclosed pain with range of motion and extension. *Id.* He assessed left SI joint dysfunction, for which he prescribed medication. *Id.*

In June 2015, Bridgers sought treatment from Dr. Jason Curry for pain management of his left SI joint dysfunction. Tr. at 687. Bridgers reported pain with movement and prolonged sitting which occasionally radiated into his left leg. *Id.* Dr. Curry assessed left SI joint dysfunction, lumbago, and bilateral knee pain. Tr. at 690. He prescribed medications. Tr. at 691.

Two months later, Bridgers returned to Dr. Doss for his pain. Tr. at 765. An examination showed crepitus in the bilateral knees with range of motion, tenderness in the back and left knee, and 4/5 strength. Tr. at 768. Dr. Doss prescribed medication. *Id.*

### D. Medical Opinion Evidence

Bridgers first maintains that ALJ Hogan failed to accord proper weight to the medical opinions of Drs. Doss and Smith, his treating providers. The Commissioner argues that ALJ Hogan properly considered this evidence. The court concludes that ALJ Hogan properly supported his reasons to afford the assessments of these providers less weight.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* §§ 404.1527(c), 416.927(c); *Nicholson* v. *Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D.W. Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

Opinions of treating physicians and psychologists on the nature and severity of impairments must be given controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Craig* v. *Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *Ward* v. *Chafer*, 924 F. Supp. 53, 55–56 (W.D. Va. 1996); SSR 96-2p, 1996 WL 374188 (July 2, 1996). Otherwise, the opinions are to be given significantly less weight.

*Craig*, 76 F.3d at 590. In determining the weight to be ascribed to an opinion, the ALJ should consider the length and nature of the treating relationship, the supportability of the opinions, their consistency with the record, any specialization of the source of the opinions, and other factors that tend to support or contradict the opinions. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Ashmore* v. *Colvin*, No. 0:11-2865-TMC, 2013 WL 837643, at *2 (D.S.C. Mar. 6, 2013) ("In doing so [i.e., giving less weight to the testimony of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

Opinions from "other sources" who do not qualify as "acceptable medical sources" cannot be given controlling weight but are evaluated under the same factors used to weigh the assessments of physicians and psychologists. SSR 06-03p, 2006 WL 2329939, at *2, 4 (Aug. 9, 2006); *see also* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (identifying "other sources"). An ALJ must explain the weight given opinions of "other sources" and the reasons for the weight given. SSR 06-03p, 2006 WL 2329939, at *6; *Napier* v. *Astrue*, No. TJS-12-1096, 2013 WL 1856469, at *2 (D. Md. May 1, 2013).

Similarly, evaluations from sources who neither treat nor examine a claimant are considered under the same basic standards as evaluations of medical opinions from treating providers whose assessments are not given controlling weight. *See* 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). The ALJ must offer an explanation of the weight given to these opinions. *Id.;*

Casey v. *Colvin*, No. 4:14-cv-00004, 2015 WL 1810173, at *3 (W.D. Va. Mar. 12, 2015), *adopted by*, 2015 WL 1810173, at *1 (Apr. 21, 2015); *Napier*, 2013 WL 1856469, at *2.

More weight is generally given to the opinion of a treating source over the opinion of a non-treating examining source. Similarly, the opinion of an examining source is typically given more weight than the opinion of a non-examining source. *See* 20 C.F.R. §§ 404.1527(c)(1), (2), 416.927(c)(1), (2). Under appropriate circumstances, however, the opinions of a non-treating examining source or a non-examining source may be given more weight than those of a treating source. *See, e.g., Mastro* v. *Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (affirming ALJ's attribution of greater weight to the opinions of a non-treating examining physician than to those of a treating physician); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Opinions from medical sources on issues reserved to the Commissioner, such as disability, are not entitled to any special weight. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, 1996 WL 374183, at *2, 5 (July 2, 1996). But the ALJ must still evaluate these opinions and give them appropriate weight. SSR 96-5p, 1996 WL 374183, at *3 ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator must evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").

### 1. Dr. Doss

Dr. Doss issued a Medical Source Statement in which he opined that Bridgers's symptoms would frequently interfere with his attention and concentration; he could sit for 60 minutes at a

time for up to six hours in an eight-hour workday and stand for ten minutes at a time for up to six hours in an eight-hour workday; he needed to shift positions at will and required unscheduled, five-minute breaks; he could frequently lift or carry less than ten pounds and occasionally lift or carry up to 20 pounds; and he would be absent two or more times per month. Tr. at 771–72.

ALJ Hogan gave little weight to this assessment, finding that it was unsupported by, and inconsistent with, other evidence in the record. Tr. at 21. ALJ Hogan noted that the Medical Source Statement provided no citations to objective findings or clinical signs supporting Dr. Doss's assessed limitations, and his contemporaneous treatment records reflected generally normal findings. *Id.*

Bridgers argues that the opinion of Dr. Doss, his treating provider, was entitled to greater weight because Dr. Doss's assessment is supported by his treatment notes. For example, Dr. Doss's records demonstrate Bridgers experienced low back pain, attributed to SI joint dysfunction. Examinations showed tenderness, positive results on objective testing, trigger points, reduced strength, and crepitus. Bridgers received injections, medications, physical therapy, and referrals to specialists to treat his conditions.

Bridgers also asserts that Dr. Doss's findings were consistent with the records of other providers. Dr. Moore noted back tenderness and spasms, which he diagnosed as SI joint dysfunction and administered an injection. Physical therapy notes reflect that Bridgers had a stiff posture, tenderness, abnormal gait and balance, and reduced range of motion. Dr. Curry noted crepitus and a positive Patrick's test. Dr. Osta observed tenderness and an abnormal gait, and described Bridgers's status as a "pain crisis." Additionally, the objective testing showed degenerative joint disease with nerve root contact and foraminal narrowing.

Despite this evidence, ALJ Hogan's determination is supported by substantial evidence. He remarked that Dr. Doss identified only two of Bridgers's impairments—HIV, which was not severe, and carpal tunnel, which resulted in numbness and tingling in his hands. *Id.* "Despite the paucity in treatment," Dr. Doss found that Bridgers could walk only one-half block, had to shift positions, needed unscheduled breaks, and would miss work one to two times per month. *Id.* The impairments Dr. Doss identified fail to support the limitations he assessed. Moreover, no manipulative limitations related to carpal tunnel were assigned even though this impairment was one of only two conditions identified in Dr. Doss's Medical Source Statement. *Id.*

Just one month prior to his Medical Source Statement, Dr. Doss found that Bridgers was independent in his activities of daily living and with ambulation, had full strength, and normal range of motion. Two months later, records reveal that Bridgers experienced pain with flexation and extension but noted that it improved with taking medications and moving around. Additional evidence showed that at various times Bridgers demonstrated normal range of motion, reflexes, sensation, and strength, and had negative straight leg tests. Although he occasionally used a cane to ambulate, there was no evidence it was prescribed. As his treatment progressed, Bridgers gait and stride improved.

Thus, although Dr. Doss had a treating relationship with Bridgers, and his records reflect symptoms relating to his carpal tunnel and back impairments, other evidence supports the finding that Bridgers was not as limited as Dr. Doss determined and had experienced some improvement with treatment. This evidence undermines the severity of restrictions found by Dr. Doss and supports ALJ Hogan's evaluation of his assessment. Finding the determination supported by substantial evidence, the undersigned declines the invitation to reweigh the evidence. *See Johnson*, 434 F.3d at 653 (a reviewing court should not undertake to reweigh conflicting evidence, make

credibility determinations, or substitute its judgment for that of the ALJ). Accordingly, the court denies Bridgers's motion on this issue.

### 2. Dr. Smith

Dr. Smith issued a Medical Source Statement in January 2013 in which she opined that Bridgers's symptoms would interfere with his attention and concentration; he could sit for ten minutes at a time for up to two hours in an eight-hour workday and he could stand or walk for ten minutes at a time for up to two hours in an eight-hour workday; he would require unscheduled breaks every 15–30 minutes; he could occasionally lift or carry up to ten pounds; and he would be absent from work four or more times per month. Tr. at 328–29.

ALJ Hogan gave minimal weight to this assessment, finding that it, too, was unsupported by, and inconsistent with, other evidence. Tr. at 22. Like Dr. Doss's opinion, he concluded that Dr. Smith's findings were not supported by her contemporaneous treatment notes and inconsistent with other evidence in the record. *Id.*

Bridgers maintains that ALJ Hogan noted generally normal examination findings as a reason to give this provider's opinion less weight but submits that the evidence supports her assessed limitations. Bridgers cites the same evidence he identified to support his argument that Dr. Doss's opinion deserved more weight. But, as noted above, other evidence in the record supports a finding that Bridgers was not as limited in functioning as these providers opined.

ALJ Hogan's determination to assign less weight to Dr. Smith's assessment is supported by substantial evidence. Several months after Dr. Smith's Medical Source Statement, Bridgers gait had improved and he was better able to move about. Subsequent treatment noted reflect his ability to ambulate continued to improve. The evidence also demonstrated that Bridgers was independent in activities of daily living. He did laundry, went grocery shopping, attended church weekly and

served as an usher, and participated in family activities. Additionally, Bridgers's treatment for his conditions was limited to routine measures such as medications, injections, and physical therapy.

In sum, the evidence belies Dr. Smith's extreme restrictions on Bridgers's ability to function. Thus, despite her treating relationship with Bridgers, Dr. Smith's limitations were not entitled to controlling weight for the reasons cited by ALJ Hogan. As substantial evidence supports ALJ Hogan's determination, Bridgers's argument on this issue lacks merit and is rejected.

### E. Visual Limitations

Bridgers also contends that ALJ Hogan erred when he considered the visual limitations assessed by Dr. Swann. The Commissioner maintains that ALJ Hogan properly weighed this evidence. The undersigned concludes that substantial evidence supports ALJ Hogan's reasons not to adopt the visual limitations assessed by Dr. Swann.

Dr. Swann opined that Bridgers could never perform tasks that required near or far visual acuity with the right eye. Tr. at 20. He further opined that Bridgers should avoid concentrated exposure to hazards such as machinery and heights. *Id.* Dr. Swann's assessment also concluded that Bridgers was capable of a reduced range of light work. Tr. at 20. He opined that Bridgers was limited to no more than frequent climbing of ramps, stairs, ladders, ropes, or scaffolds and no more than frequent stooping. *Id.*

ALJ Hogan gave little weight to Dr. Swann's opinion, finding that subsequent evidence revealed Bridgers to be more limited, thus warranting additional limitations. Tr. at 20–21. Bridgers contends, however, that the visual limitations set forth in the RFC are less restrictive than Dr. Swann found.

It appears clear that ALJ Hogan was referencing exertional and postural limitations when he determined that Bridgers was more limited than Dr. Swann described. While Dr. Swann found

15

Bridgers could frequently climb ramps, stairs, ladders, ropes, or scaffolds and frequently stoop, the RFC limited Bridgers to no climbing of ladders, ropes, or scaffolds, only occasional climbing ramps and stairs, and only occasional stooping. Tr. at 13.

The RFC also accounted for visual limitations by finding that Bridgers must avoid concentrated exposure to hazards such as moving machinery and unprotected heights and by eliminating work that requires depth perception. Tr. at 13, 19. ALJ Hogan's determination that more-restrictive visual limitations were not warranted is supported by substantial evidence. ALJ Hogan noted Bridgers's impaired right eye vision but remarked that his main complaint concerned itchiness and dryness. Tr. at 15. When testifying at the hearing, Bridgers made no mention of his eyesight or the symptoms it caused. Tr. at 19. It did not appear to limit his activities of daily living. The medical record was similarly silent of limitations relating to his vision. *Id.* Despite his lack of right eye vision, in June 2013, Bridgers's left eye has a visual acuity of 20/50 uncorrected and 20/40 with corrective lenses. Tr. at 16, 393. By October, his corrected vision was 20/20 in the left eye. Tr. at 16, 427.

ALJ Hogan also noted that Bridgers was scheduled to undergo cataract removal on the right eye, which would likely improve his vision. But the record lacked evidence that the surgery occurred. Tr. at 17, 19.

In sum, the evidence supports a finding that Bridgers's vision did not support greater restriction than ALJ Hogan determined in his RFC finding. As noted above, Bridgers's left eye vision was correctable to perfect acuity, he made no allegations about how his vision restricted his activities or functional abilities, and the medical record did not support greater visual restrictions. As substantial evidence supports ALJ Hogan's determination that Bridgers's vision is not more limited, his argument on this issue lacks merit.

### F. Step Five

Finally, Bridgers asserts that ALJ Hogan erred at step five by failing to resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT") related to his limited vision. He further asserts that ALJ Hogan failed elicit testimony that included all of his limitations. The Commissioner maintains that there was no conflict between the VE's testimony and the DOT. She further contends that the VE's testimony reflected all of Bridgers's well-supported limitations. The undersigned finds that the step five determination is supported by substantial evidence and any error if failing to identify a conflict with one of the three positions found suitable for Bridgers was harmless.

As noted above, while a claimant has the burden at steps one through four, it is the Commissioner's burden at step five to show that work the claimant is capable of performing is available. *Pass*, 65 F.3d at 1203 (citing *Hunter* v. *Sullivan*, 993 F.2d 21, 35 (4th Cir. 1992)). "The Commissioner may meet this burden by relying on the Medical-Vocational Guidelines (Grids) or by calling a vocational expert [("VE")] to testify." *Aistrop v. Barnhart*, 36 F. App'x 145, 146 (4th Cir. 2002) (citing 20 C.F.R. § 404.1566)). The Grids are published tables that take administrative notice of the number of unskilled jobs at each exertional level in the national economy. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a).

When a claimant suffers solely from exertional impairments, the Grids may satisfy the Commissioner's burden of coming forward with evidence as to the availability of jobs the claimant can perform. *Grant* v. *Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983). When a claimant: (1) suffers from a non-exertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional impairment which restricts him from performing the full range of activity covered by a work category, the ALJ may not rely on the Grids and must

produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant. *See Walker* v. *Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *Hammond* v. *Heckler*, 765 F.2d 424, 425–26 (4th Cir. 1985); *Cook* v. *Chater*, 901 F. Supp. 971 (D. Md. 1995); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h).

The Regulations permit testimony from a VE to determine "whether [a claimant's] work skills can be used in other work and the specific occupations in which they can be used[.]" 20 C.F.R. §§ 404.1566(e), 416.966(e). In order for a VE's testimony to be relevant, an ALJ's hypothetical question must represent all of a claimant's substantial impairments. *Walker*, 889 F.2d at 50; *Burnette* v. *Astrue*, No. 2:08-cv-0009-FL, 2009 WL 863372, at *4 (E.D.N.C. Mar. 24, 2009) (relevant hypothetical question should adequately reflect claimant's RFC and fairly set out a claimant's limitations). If limitations are omitted, the VE's testimony is of limited value, and may not constitute substantial evidence. *See Johnson*, 434 F.3d at 659 (citing *Walker*, 889 F.2d at 50).

Before relying on a VE's testimony an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the Dictionary of Occupational Titles (DOT), . . . and [e]xplain in the determination or decision how any conflict that has been identified was resolved." SSR 00–4P, 2000 WL 1898704 (Dec. 4, 2000). "Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT." *Id.* "When there is an apparent unresolved conflict between VE . . . and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . to support a determination or decision about whether the claimant is disabled." *Id.* "At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency." *Id.*

ALJ Hogan asked the VE if her testimony was consistent with the DOT and its companion volume, the Selected Characteristics of Occupations ("SCO"). Tr. at 24, 57. The VE responded that it was consistent. *Id.*[4]

Bridgers asserts the VE's identification of the parking lot attendant job conflicts with the DOT, which describes that position as requiring frequent depth perception. As noted above, ALJ Hogan's RFC determination precluded work that required depth perception. Tr. at 13. Accordingly, there is a conflict and it was an error for ALJ Hogan to find, at step five, that the parking lot attendant job was compatible with Bridgers's RFC.

However, any error in failing to recognize this conflict is harmless where, as here, the VE identified two other jobs—cashier and furniture rental consultant—that Bridgers can perform. *See Jacobs* v. *Colvin,* No. 7:13-cv-184-RJ, 2015 WL 1471256, at * 9 (E.D.N.C. Mar. 31, 2015) (any error by VE in failing to explain conflict between DOT description of cleaner job and RFC limitation of no kneeling was harmless because other positions identified that claimant could perform); *Taylor* v. *Astrue*, No. 5:10–CV–263–FL, 2011 WL 1599679, at *13 (E.D.N.C. Mar. 23, 2011) (finding error in relying on non-postal mail clerk position was harmless where the VE identified other jobs that the hypothetical individual could perform) (citation omitted).

Bridgers asserts that the there is a conflict with cashier and furniture rental consultant jobs because the DOT describes these positions as requiring frequent near visual acuity. However, the RFC contains no such restriction on Bridgers's visual acuity. As noted above, ALJ Hogan declined to adopt Dr. Swann's assessment of this limitation. Accordingly, the near visual acuity requirement of the cashier and furniture rental consultant positions does not present a conflict with Bridgers's

---

[4] Although unrelated to any visual limitation, the VE stated that restrictions for overhead reaching, frequent breaks, absenteeism, and a sit/stand option were based on her professional training and experience. Tr. at 57.

RFC. Therefore, the identification of these positions satisfies the Commissioners step five burden. Consequently, this issue does not warrant remand.

## III. Conclusion

For the forgoing reasons, the court denies Bridgers's Motion for Judgment on the Pleadings (D.E. 20), grants Berryhill's Motion for Judgment on the Pleadings (D.E. 24), and affirms the Commissioner's determination. This action is dismissed. The Clerk shall close this case.

Dated: January 10, 2018

_____
Robert T. Numbers, II
United States Magistrate Judge